# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00031-CV

### Charles "Chip" Weersing, Appellant

### v.

### OneTouchPoint Southwest Corp. d/b/a Ginny's, Appellee

## FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
## NO. D-1-GN-19-004820, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I respectfully dissent.  In my view, the Court has improperly shifted the traditional summary-judgment burden to the nonmovant Weersing and is viewing the evidence in the light most favorable to the movant OneTouchPoint (OTP) instead of in the light most favorable to Weersing.  I would reverse the trial court's summary judgment dismissing Weersing's claims.

The Court concludes that there was no valid, enforceable contract between Weersing and OTP because "OTP's evidence demonstrated that there is not a genuine issue of material fact regarding the existence of the contract and Weersing's evidence does no more than create a mere surmise or suspicion that the fact exists."  (Slip op. at 8.)  By moving for summary judgment on the element of the existence of a valid contract, OTP bore the burden to conclusively prove, i.e., prove as a matter of law, that there was no valid contract, or stated another way, to negate the existence of a valid contract as a matter of law.  *See* Tex. R. Civ. P. 166a(c) (establishing that movant must show (1) there is no genuine issue of material fact and (2) movant "is entitled to

judgment as a matter of law"). "For a defendant to be entitled to summary judgment it must *disprove,* as a matter of law, one of the essential elements of each of plaintiffs' causes of action." *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

We should begin by "assuming the facts are as asserted by plaintiff[]." *Id.* To summarize the evidence in the light most favorable to Weersing, Weersing asserts that OTP, which owns Ginny's, a paper and printing company, rehired him as a Ginny's account executive on January 29, 2014. Weersing had previously worked for Ginny's as an account executive from 2007 to 2012, and he earned an 8% commission then.[1] Weersing contends that in 2014 OTP promised to pay him an 8% commission for two years on all new accounts and that the new-hire paperwork, which states "earns 8% com[mission] on everything until we transition com[mission] plan then he gets st[andard] plan," memorializes that agreement. Weersing testified at his deposition that his roles were the same during both periods that he worked for the company: "[p]rospecting new business, bringing new business in, managing accounts." He also testified that as a salesperson who had to provide price quotes to bid for customers, he had to understand the printing production process and understand and keep track of the client's production needs.

In October 2014, Weersing procured the Erin Condren account on OTP's behalf. Erin Condren is a retail company that sells paper-bound planners, calendars, and notebooks to the public. Although the parties disagree to some extent about the cause of the production problems, there is general agreement that it was a complicated and difficult account to service, and that at least once, in fall 2015, there was a production problem that generated unusable product that had

---

[1] OTP purchased Ginny's in 2011.

to be written off at a loss of approximately $200,000. OTP paid Weersing 8% commission on the account until September 2015.

In September 2015, OTP reduced Weersing's commissions from 8% to 5.5%. Weersing testified that at a meeting in early 2016, OTP first provided to its sales force, including him, the "OneTouchPoint Sales Executive Compensation Plan" (attached to his live petition), which for the first time established a system for assigning one of three commission levels to accounts. The levels were 3%, 5.5%, and 8%, to be assigned depending on the mark-up, profit, and contribution rates for the accounts or jobs (although no specific definitions were provided for "low," "standard" and "above average" rates). The document states "typically all new accounts are assigned at level 8 for the first two years of activity if above pricing expectations are met." An asterisk at the end of that sentence noted that "[a]ll commission rate assignments for accounts and/or jobs are at the discretion of the President and VP of Sales." In May 2016, OTP informed Weersing that his commission on the Erin Condren account was being reduced again from 5.5% to 3%.

Weersing testified that each time his commission on the Erin Condren account was reduced, he contacted upper management (in 2015 the Austin facility president and in 2016 OTP's CEO; the Austin facility president; Weersing's sales manager, who was vice president of sales; and the human-resources manager) to complain about the reduction in his commission from his original "deal" for 8%, when in his view, the account was becoming less profitable because of OTP's production problems. Notably, OTP does not assert, and nothing in the summary-judgment evidence suggests, that anyone in OTP's management ever told Weersing that his stated understanding that his initial deal was 8% commission on new accounts for two years was incorrect.

3

In its summary-judgment motion, OTP sought to disprove as a matter of law the existence of a valid contract between the parties. To do so, OTP argued that (1) the new-hire payroll form is not a contract and contains no promissory language evidencing OTP's intent to be contractually bound; (2) the form does not state what Weersing is providing as consideration for the promise of an 8% commission; and (3) the contract left key material terms open for further negotiation, including how long Weersing would work for OTP, when his commission would transition to the standard plan, or what the terms of the standard plan would be, and therefore, it is not a binding agreement.

However, OTP did not proffer *any* evidence that it had not agreed in January 2014 to pay Weersing an 8% commission on new accounts for the first two years. Although it attached Chris Greene's declaration in support of its motion, nothing in the declaration contradicts Weersing's testimony. As Greene noted in that declaration, he did not become the president of OTP's Denver and Austin locations until 2016—two years after Weersing had been hired. He did not attest that he was involved in hiring Weersing as a sales executive. In his deposition testimony attached to Weersing's response, he testified that he was not at the Austin office or involved at all in hiring Weersing in January 2014.

Greene testified that his understanding was that the standard commission plan for sales executives in 2014 was 8% commission on new accounts for the first two years and 5.5% after that. When asked about the language on Weersing's new-hire payroll form, he said the language on the form was "pretty straightforward that [Weersing] would get eight percent on everything," and he did not know why Weersing was not put on the standard commission plan when he started in 2014. He also acknowledged that he did not know whether the caveat on the 2016 Compensation Plan that commission-rate assignments for accounts or jobs are ultimately at

the discretion of either the president or vice president of sales had been conveyed to Weersing in 2014.[2] He was not sure who had hired Weersing, but he assumed it was either the president of the Austin facility (whom Greene replaced) or the vice president of sales, both of whom were no longer at the company. In short, OTP did not present any summary-judgment evidence showing that it had not agreed to pay Weersing an 8% commission on new accounts for the first two years.

In response to OTP's summary-judgment motion, Weersing contended that OTP's 2014 promise to pay him 8% commission on new accounts for the first two years constitutes a unilateral contract, and that by bringing in the Erin Condren account, he performed on the contract, making it enforceable. *See, e.g.*, *Vanegas v. American Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009). Weersing further asserted that the new-hire payroll form memorialized the parties' agreement. The "Payroll/Personnel Status Change Request" adds Weersing as a new Ginny's employee (but notes he is a re-hire), states his job title of "Acct Exec," shows his pay as a "$48,000 draw" (both Weersing and Greene testified that this was a draw against commission, not a salary), and states he "earns 8% com[mission] on everything until we transition com[mission] plan then he gets st[andard] plan."

---

[2] Viewing the evidence in the light most favorable to Weersing, we should credit this testimony and disregard Greene's conclusory statements in his declaration that "OTP has always had a policy of adjusting commissions on accounts when they are not sufficiently profitable," "OTP has always retained discretion to adjust commissions on any account based on management's assessment of the overall health of the account," and "[t]he company's discretion to adjust commission rates is a long-standing policy that all OTP salespersons knew or should have known," especially given that Greene did not become president of the Austin facility until November 2016. *See Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022) ("We review summary judgments de novo, viewing the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." (quoting *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019)).

In contrast to "a bilateral contract, in which both parties make mutual promises, a unilateral contract is created when a promisor promises a benefit if a promisee performs." *City of Houston v. Williams*, 353 S.W.3d 128, 135-36 (Tex. 2011) (citations omitted). As the Texas Supreme Court explained in *Williams*, "the requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in 'exchange for the promise is something other than a promise,' i.e., performance." *Id.* (quoting RESTATEMENT OF CONTRACTS § 12 cmt. a (1932)). A unilateral contract becomes enforceable when the promisee performs. *Vanegas*, 302 S.W.3d at 302 (citing, *e.g.*, 1 Richard A. Lord, WILLISTON ON CONTRACTS § 1.17 (4th ed. 2007) ("A unilateral contract occurs when there is only one promisor and the other accepts, not by mutual promise, but by actual performance . . . .")). Thus, the Texas Supreme Court concluded in *Williams* that "a unilateral employment contract is created when an employer promises an employee certain benefits in exchange for the employee's performance, and the employee performs." *Williams*, 353 S.W.3d at 136; *see also id.* at 138-39 (holding that city ordinances constituted unilateral employment contract with city firefighters within applicable statute's waiver of immunity after analyzing, among other elements, whether ordinances constituted contract in writing that stated essential terms of agreement as required under statute).

Addressing each of OTP's legal arguments in turn, I would conclude that (1) the new-hire payroll form contains promissory language because it states Weersing is being hired as an account executive to be paid a $48,000 draw against commission and an 8% commission on everything he brings in, and Weersing testified that he had been hired at 8% commission for two years on all new work; (2) Weersing's performance is the consideration for OTP's promise of an 8% commission; and (3) a unilateral employment contract does not require a statement of any of the terms that OTP describes as "key material terms" that were left open for further negotiation.

6

There was no need for a term stating how long Weersing would work for OTP to make the contract enforceable. OTP hired Weersing as an account executive to be paid a draw against commissions and stated it would pay him 8% commission on "everything," i.e., all new accounts or jobs he brought in. Weersing accepted OTP's offer and performed by bringing in the Erin Condren account and serving as its account executive. *See Vanegas*, 302 S.W.3d at 304 (holding that company's alleged promise to pay any remaining original employees 5% of proceeds when company was sold became enforceable when employees accepted offer and performed by staying with company until its sale). Similarly, the fact that the new-hire form stated that Weersing's commission compensation would eventually transition to the standard plan but did not say when that transition would occur or what the standard plan's terms would be does not render unenforceable OTP's promise to pay him 8% commission on business, such as the Erin Condren account, that had been brought in before any transition to a new commission plan occurred. Therefore, based on my review of the record and considering the evidence in the light most favorable to Weersing, I would conclude that OTP failed to conclusively disprove the existence of a unilateral contract, such that the burden then shifted to Weersing to produce evidence creating a fact issue. *See Stanfield v. Neubaum*, 494 S.W.3d 90, 96-97 (Tex. 2016). Consequently, I would reverse the summary judgment and remand the case to the trial court for further proceedings.

Because I conclude that the Court improperly shifted the burden to Weersing to present evidence creating a fact issue when OTP failed to negate the existence of a valid contract, *id.*, and that in evaluating the record, the Court has not viewed "all evidence favorable to the nonmovant [Weersing] as true and indulge[d] every reasonable inference in [Weersing's] favor," *id.* at 97 (quoting *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)), I respectfully dissent.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Filed:   January 31, 2024